# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

TONYA MORRISON,

        **Plaintiff,**                     **Case No.  2:06-cv-283**
                                                  **JUDGE GREGORY L. FROST**
      **v.**                               **Magistrate Judge Terence P. Kemp**

ROBERT J. STEPHENSON, MUSKINGUM
COUNTY SHERIFF, et al.,

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment - Excessive Force Claim (Doc. # 108), Plaintiff's Second Motion for Partial Summary Judgment - Employer Liability (Doc. # 109), and the Motion for Summary Judgment by Muskingum County Defendants (Doc. # 111).  For the reasons that follow, the Court **DENIES** both of Plaintiff's motions and **DENIES IN PART and GRANTS IN PART** Defendants' motion.

## I.  BACKGROUND

At the outset, the Court notes that the facts in this case are hotly disputed by the parties.

On April 3, 2005 at approximately 2 a.m. Deputy Anthony J. Angelo of the Muskingum County Sheriff's Office was dispatched to the South Town Café because of a reported fight. (Doc. # 84, Deposition Deputy Angelo "Angelo Dep." at 17.)  Deputy Angelo entered the front door of the Café and ordered everyone to go outside and to separate.  *Id.* at 22-24.  Angelo claims that there were approximately forty to fifty people in the Café at that time.  *Id.*  Plaintiff, however, avers that there were only thirteen.  (Doc. # 82, Deposition of Plaintiff "Pl. Dep." at 132.)

Deputy Matthew Wilhite and Deputy Justin Thompson arrived as the patrons were exiting the Café.  (Doc. # 92, Deposition of Deputy Wilhite "Wilhite Dep." at 14.)  Deputy Angelo testified that Plaintiff was stumbling when she came out of the Café and that it appeared difficult for her to keep her balance.  Angelo Dep. at 110-11.  Deputy Angelo further claims that Plaintiff was yelling and cursing and acting belligerent.  *Id.* at 40-51.  Deputies Angelo, Wilhite, and Thompson and the co-owner of the Café, Darla Donaldson, saw plaintiff swing her fist and hit Deputy Wilhite.  *Id.* at 51; Wilhite Dep. at 42-3; (Doc. # 87, Deposition of Deputy Thompson "Thompson Dep." at 19; Doc. # 72 -3, Deposition of Donaldson "Donaldson Dep." at 42).

Plaintiff testified that she was upset when the deputies arrived but that she was not cursing.  Pl. Dep. at 132-33.  Further, Plaintiff claims that Deputy Wilhite "started yelling at me and then he started shoving me with sort of with his chest and I lost my balance.  And my hand brushed across his shoulder and he said that I assaulted him." *Id.* at 134.  Plaintiff was arrested by Deputy Wilhite for assault on a peace officer.  *Id.*

Deputy Angelo escorted Plaintiff to the sheriff's vehicle and Plaintiff stated that she was an undercover agent for the FBI and that she may be carrying a video recorder in her purse.  Angelo Dep. at 56-7, 75; Pl. Dep. at 155.  After Plaintiff had been placed under arrest in the cruiser, one of Plaintiff's friends, Angie Quinn, opened the door and let Plaintiff out.  Quinn at 28.  Plaintiff claims that she was not trying to escape custody when she got out of the cruiser and instead, avers that Quinn told her that Deputy John B. Hittle wanted her to take her purse to him so that he could obtain the car keys that belonged to Plaintiff's friends, so she got out of the sheriff's vehicle.  Deputy Wilhite observed Plaintiff walking away from the vehicle and stopped her and placed her back in the cruiser.  Pl. Dep. at 151-53;  Wilhite Dep. at 71-2; Donaldson

Dep. at 61.  Quinn was arrested for attempting to allow Plaintiff to escape. Angelo Dep. at 86.

Plaintiff's other friend, Trinda Walter, was arrested for disorderly conduct.  *Id.* at 76.  The three

women were taken to jail in a sheriff's van.  Pl. Dep. at 154-55.

Deputy Mark Hendershot was working at the booking counter in the jail on that evening

along with Corporal Joshua Whiteman, Deputy Erin Inman, and Corrections Officer Greg Ford.

(Doc. # 87-3, Deposition of Deputy Hendershot "Hendershot Dep." at 16-17).  Deputy

Hendershot testified that he was not able to enter the complete book-in information into the

computer regarding Plaintiff because she was uncooperative and was screaming profanities.  *Id.*

48, 100.  Plaintiff denies that she was yelling or was uncooperative in any way.

All agree that Plaintiff was then escorted to holding cell 116.  Inman testified that she and

Wilhite escorted Plaintiff to the holding cell; however, Wilhite denies that he escorted Plaintiff

to the holding cell and instead claims that it was Inman and Foster who did so.  (Doc. # 89,

Deposition of Deputy Inman "Inman Dep." at 61)[1]; Wilhite Dep. at 108-09.  Foster denies that

she saw Plaintiff that day.  Foster Dep. at 14-15.  Plaintiff alleges that on the way to the holding

cell, Wilhite used the taser on her lower back without any provocation or justification, which

caused her to fall to the ground.  Pl. Dep. at 169-170, 172.

Inman and Wilhite deny this happened.  Inman Dep. at 84-5; Wilhite Dep. at 108-09.

All agree that Plaintiff was placed in cell number 116, which has concrete block from the

floor to about half-way up the wall and then a large glass window to the ceiling making the

interior of the room fully visible to deputies outside of it in the booking area.  Hendershot Dep.

---

[1]Deputy Erin Inman is married and now goes by her married name "Fuller."  Inman Dep.
at 5.  For purposes of this Opinion and Order, the Court will refer to Mrs. Fuller as Deputy
Inman.

at 31-38.  After she was placed in the holding cell, Plaintiff began to yell:

> A.  I was scared.  I couldn't breathe.  My heart was beating 90 miles a minute.  I
> thought I was having a heart attack . . .  I didn't know any side effects of the taser
> and my body was trembling and shaking and. . .  I needed some help.  And I
> yelled out for somebody to help me. . .  And I was told to shut the fuck up.
> Repeatedly and repeatedly.

Pl. Dep. at 174-75.

The parties agree that, Officers Angelo and Whiteman both heard Plaintiff yell that she
had a heart condition and that she needed her medication.  Angelo at 99, Whiteman at 114.
Plaintiff told Deputy Whiteman that the medication was in her purse, which she had given to her
brother.  Whiteman Dep. at 114.  Corrections Officer Ford made phone calls to Plaintiff's
brother and others to obtain the medication.  *Id.*  Plaintiff's boyfriend brought the medication to
the jail; however, it was not in her prescription bottle so she was not allowed to have it.  The
medication was not heart medication, and instead was a type of anxiety medication.  Pl. Dep. at
58, 246.      Defendants, however, contend that once Plaintiff was placed in the holding cell
she began yelling profanities such as "fuck the police" and threats such as "her attorneys were
going to have the [officers'] jobs."  Inman Dep. at 81; Hendershot Dep. at 113; Angelo Dep. at
98.  Defendants contend that they also heard her yelling about needing medication, a phone call,
to speak to her father and demanding to be tested for alcohol and drugs.  (Doc. # 93, Deposition
of Corporal Whiteman "Whiteman Dep." at 110-114).  Defendants further claim that Plaintiff
was banging her fists and arms against the glass windows in the holding cell, even after she had
been ordered several times to stop; however, all agree that Plaintiff did not have any visible
injury to her arms and hands.  (Doc. # 71-1, Deposition of Deputy John B. Hittle "Hittle Dep." at
34-5);  Angelo Dep. at 99-103; Wilhite Dep. at 112-14, 123-24; Inman Dep. at 63-4, 78.

Defendants assert that Plaintiff had been in the holding cell for approximately forty four minutes when Corporal Whiteman told Plaintiff that she would be placed in a restraint chair if she did not stop beating on the glass.  Whiteman Dep. at 117;  Inman Dep. at 84.  The restraint chair is appropriately used to prevent arrestees from hurting themselves.  Corporal Whiteman was the shift commander and it was his duty to maintain the safety and the security of the jail facility.  Whiteman Dep. at 18, 34.  Corporal Whiteman asked Deputy Hittle to send assistance to Deputy Inman to place Plaintiff in the restraint chair.  Hittle Dep. at 42.  Deputy Hittle sent Deputies Wilhite and Angelo to help.  *Id.*  The three deputies entered the holding cell and ordered Plaintiff to come and to sit in the restraining chair that had been brought to her door.  Angelo Dep. at 114.  Deputy Inman attempted to escort Plaintiff to the chair and Plaintiff fought away from her and moved to the sink/toilet combination that was in the corner of the cell and grabbed it, stating that she was not going to go to the chair.  Angelo Dep. at 114; Inman Dep. at 67.  Deputy Wilhite then made the decision to taser Plaintiff for everyone's safety.  Wilhite knew, at the time he made this decision, of a recent incident where another officer had been in a jail cell and, in a struggle, had fallen and cracked his head open due to the small confinement of the cell.  Wilhite Depo. at 198.

Plaintiff, however, maintains that she was not beating on the windows nor was she yelling profanities before the deputies entered cell 116:

Q. Were you banging on the doors when you were in the cell?

A. No.

Q. Were you banging on the walls?

A. They're concrete.

5

Q. So the answer is no, you weren't banging on the doors or the walls?

A. No.

Q. What happened after that?

A. I was told to shut the fuck up again and again.  And then all of a sudden my door was brought opened and Inman and Wilhite came in to my cell both with Tasers in hand and I knew I was about to get it again.  So I ran over to the toilet/sink attachment and I held onto it.  And they said we're going to show you what we do to people that hit cops.  And then Wilhite tazered (*sic*) me again.  And then I was taken out of the cell and I was placed into a restraint chair.

Pl. Dep. at 176-77.

After Plaintiff was strapped in the restraint chair, she testified that she was repeatedly tasered:

Q. And you said Wilhite repeatedly tased (*sic*) you?

A. Yes.

Q. This is while you were in the restraint chair?

A. Yes. . . they said this is what we do to people that assault police officers.  And he repeatedly stuck the Taser in and repeatedly tasered me until - - I just kept screaming and crying for help, because it was the most intense pain I've ever experienced in my life.  And until my body actually started shaking and went in convulsion and I foamed at my mouth and passed out.

Q. When you said he repeatedly tased (*sic*) you, how many times did he tase (*sic*) you?

A. Three that I can recall. . . the taser was held into my backside.  It was held in and then it was moved and then he held it again.

Pl. Dep. at 190-91.

Defendants deny Plaintiff's allegations, arguing that Plaintiff was not tasered while in the restraint chair, and that she was placed in the chair to keep her from harming herself and from banging on the walls and the door of her cell.  Inman Dep. at 116.

6

Plaintiff claims also that, Deputy Hendershot kicked her in the right thigh when he was letting her out of the restraint chair.  Pl. Dep. at 205.  Yet, when Plaintiff's attorney came to see her at the jail that night, she only informed him of the tasering and said nothing of the alleged kick.  Doc. # 123, Affidavit of Herbert W. Baker, Jr.)  Shortly after her release from jail, however, Plaintiff had some color photographs taken of her injuries, including the injury she alleges occurred when Defendant Hendershot kicked her.  *Id.* 224-25 and *Exhibit D*.  Hendershot denies this allegation.  (Doc. # 111 at 28.)

On April 15, 2005, Plaintiff went to the Muskingum County Sheriff's Office and filed a civil complaint about her treatment the night of her arrest.  Pl. Dep. 251.

Plaintiff ultimately pleaded guilty to persistent disorderly conduct, assault, and escape. Pl. Dep. at 302.

On April 20, 2006, Plaintiff filed this action and on August 17, 2007, Plaintiff filed the Second Amended Complaint.  (Doc. # 96.)  Plaintiff brings this action under 42 U.S.C. § 1983 ("Section 1983") and 42 U.S.C. § 1985 ("Section 1985") against Muskingum County Sheriff Robert J. Stephenson in his official capacity and against Deputies Wilhite, Inman, Angelo, Hendershot and Corporal Whiteman in their personal capacities for allegedly violating her rights secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution. Plaintiff also alleges a cause of action under Ohio law.

On September 7, 2007, Defendants filed a motion for summary judgment on all Plaintiff's claims.  (Doc. # 111.)  Plaintiff filed a memorandum in opposition to that motion on October 1, 2007 (Doc. # 123) and on October 15, 2007 Defendants filed their reply in support of their motion (Doc. # 131).

Also on September 7, 2007, Plaintiff filed two motions for partial summary judgment (Doc. ## 108, 109) and on October 1, 2007, Defendants filed their memoranda in opposition to those motions (Doc. ## 122, 124).  Plaintiff filed her replies in support of her motions on October 12, 2007.  (Doc. ## 128, 129).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *See Muncie Power Products, Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*,

8

477 U.S. at 251-52).

### III.  SECTION 1983 CLAIMS

Section 1983, provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To succeed on a claim under Section 1983, a plaintiff must show that (1) a person acting under color of state law (2) deprived them of rights secured to them by the United States Constitution or its laws.  *Waters v. City of Morristown,* 242 F.3d 353, 358-59 (6th Cir. 2001).  Because Section 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under Section 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

In the instant action, Plaintiff brings claims for excessive use of force and excessive use of force customs and policies both in violation of the Fourth Amendment, denial of medical care in violation of the Eighth Amendment, retaliation for Plaintiff's complaints and requests for medical care in violation of the First Amendment, and "governmental suppression of evidence or cover-up" in violation of the Fifth and Fourteenth Amendments.  Defendants move for summary judgment on all of these claims except the retaliation[2] claim and Plaintiff moves for summary

---

[2]As Plaintiff points out in her memorandum *contra* Defendants' motion for summary judgment:

Retaliation in violation of the First Amendment is alleged in paragraph 16 of the Second Amended Complaint. The Defendants' Motion for Summary Judgment made no argument directed toward this claim.  We nevertheless have pointed out

judgment on two of the Fourth Amendment claims.

**A. Excessive Use of Force Allegations - Fourth Amendment**

In *Graham v. Connor*, 490 U.S. 386, 388 (1989), the United States Supreme Court held

that excessive force claims are to be analyzed under the Fourth Amendment's reasonableness

standard and clarified "that the reasonableness inquiry in an excessive force action is an

objective one, which should disregard the underlying intent or motivation of the defendant.

*Russo v. Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992).  "To determine whether exigent

circumstances exist, a court should look to the 'facts and circumstances of each particular case,

including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to

the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to

evade arrest by flight.'"  *Id.* (citing *Graham*, *supra*, at 396); *see also Lewis v. City of Irvine*, 899

F.2d 451 (6th Cir. 1990) (embracing the analysis in *Graham*); *McDowell v. Rogers*, 863 F.2d

1302, 1307 (6th Cir. 1988) ("Our court has repeatedly found that a totally gratuitous blow with a

policeman's nightstick may cross the constitutional line . . . .").

In the case *sub judice*, Plaintiff advances four distinct excessive force claims, *i.e.*, being

tasered on the way to the holding cell, being tasered in the holding cell, being tasered while

strapped in the restraint chair and being kicked when released from the restraint chair.

Defendants agree that Plaintiff was tasered while in the holding cell and deny all other

allegations.

---

some of the evidence supporting a retaliation claim, rather than merely rest upon
our pleading.

(Doc. # 123 at 17.)

**1.  The alleged uses of force that are denied by Defendants**

First, Plaintiff claims that, as she was escorted from the entrance or booking area of the Muskingum County Sheriff's Department to the holding cell by Deputies Inman and Wilhite, she was tasered in her lower back area by Deputy Wilhite.  Plaintiff testified that she was not resisting the deputies in any way and that the taser was used without any provocation or justification.  Inman agrees that she and Wilhite escorted Plaintiff to the holding cell, but denies that Wilhite used the taser on Plaintiff.  Wilhite, however, not only denies that he used the taser on Plaintiff he further denies that he escorted Plaintiff to the holding cell and instead, claims that Deputy Foster and Deputy Inman did so.  Deputy Foster denies that he escorted Plaintiff and contends that he did not even see Plaintiff while she was at the department that day.

Second, Plaintiff alleges that after she was strapped into the restraint chair, Deputy Wilhite repeatedly shocked her with the taser and that this was witnessed by Deputies Inman and Angelo.  Plaintiff avers that the deputies said to her that "this is what we do to people that assault police officers."  Pl. Dep. 190-91.  One of Plaintiff's attorney's avers that he visited Plaintiff at the jail and that she told him she had been tasered several times.  Defendants deny that Plaintiff was tasered while in the restraint chair.

Finally, Plaintiff testified that as she was being released from the restraint chair, Deputy Hendershot kicked her in her right thigh without provocation.  Defendant Hendershot denies that this occurred arguing that, "Plaintiff's friend who was in the cell next to Plaintiff and could see Plaintiff without any block of her vision, has sworn under oath that Plaintiff was never kicked[3]

---

[3]This statement is factually incorrect.  Ms. Quinn merely testified that she did not observe Plaintiff being kicked, which, of course, is not the same thing as "swearing under oath that Plaintiff was never kicked."

(Quinn Depo., p. 52-53, 62)," that Defendants' interpretation of the pictures of Plaintiff do not show the "outline of a boot," and that although Plaintiff's attorney came to the jail to see the marks she claimed were caused by a taser she told him nothing about being allegedly kicked by any officer.

Defendants claim that Plaintiff's testimony is proven to be false by the taser printouts that they have submitted as evidence, which they claim undeniably show that only Deputy Wilhite's taser was fired on the date in question and that it was fired only twice, which, comports with Wilhite's testimony that he showed a female arrestee the arc of his taser and tasered Plaintiff one time on the night in question.

However, Plaintiff rebuts this evidence with photographs that were taken shortly after her release from jail which show several marks on her back that she claims were left from the taser and a bruise on her thigh that she claims is from Deputy Hendershot's kick.  Also, Plaintiff submits an affidavit from an attorney who visited her in jail which avers that Plaintiff told him that she had been tasered several times by Deputy Wilhite.  Finally, Plaintiff points out that the interpretation of the taser printouts is debatable, as is shown by Defendants' expert averring the he viewed "some Taser evidence" and not explicitly referring to data he reviewed regarding the taser use on the day in question.  Plaintiff also highlights Defendants' in-house taser expert's confusion regarding the taser printouts and the two defense experts inconsistent interpretation of the taser printouts.  (Doc. # 123 at 27-31.)

Viewing all of the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the evidence presents disagreement on critical facts, which, cannot be resolved by this Court in a decision on a motion for summary judgment.  Indeed, this

12

Court is prohibited from weighing the evidence or making credibility determinations, which

exclusively the province of the jury.  Accordingly, this Court **DENIES** Defendants' Motion for

Summary Judgment on the alleged excessive uses of force that Defendants deny occurred.

    **2.  The alleged Taser use in cell number 116**

    All parties agree that Plaintiff was tasered while she was holding on to the sink/toilet

apparatus in holding cell number 116.  Defendants, however, argue that they are entitled to be

relieved of responsibility for this action by the affirmative defense of qualified immunity.  This

Court disagrees.

    In *Saucier v. Katz*, the United States Supreme Court instructed federal courts to use a

two-step analysis to assess the applicability of the qualified immunity affirmative defense.[4]

*Saucier*, 533 U.S. at 201.  The "initial inquiry" must be whether the officer's alleged conduct

violated a constitutional right.  *Id.*  "If no constitutional right would have been violated were the

allegations established, there is no necessity for further inquiries concerning qualified

---

    [4]The United States Court of Appeals for the Sixth Circuit occasionally employs a
three-step qualified immunity analysis, as opposed to the two-step analysis set forth here.  As
two recent opinions indicate, both the two-step approach and the three-step approach can be said
to capture the holding of *Saucier v. Katz*, 533 U.S. 194 (2001).  Compare *Dunigan v. Noble*, 390
F.3d 486, 491 n.6 (6th Cir. 2004) (two-step approach), with *Radvansky v. City of Olmsted Falls*,
395 F.3d 291, 302 (6th Cir. 2005) (three-step approach).  The three-step approach adds a third
prong to the analysis: "whether the plaintiff offered sufficient evidence to indicate that what the
official allegedly did was objectively unreasonable in light of the clearly established
constitutional rights."  *Radvansky*, *supra* (citation omitted).  In cases subsequent to *Saucier* the
Supreme Court has not formally broken up the two steps prescribed by *Saucier* into three steps,
*see, e.g., Brosseau v. Haugen*, 543 U.S. 194 (2004) and *Groh v. Ramirez*, 540 U.S. 551 (2004),
but the three-step approach may in some cases increase the clarity of the proper analysis.  *See
Estate of Carter v. City of Detroit*, 408 F.3d 305, 311. n.2 (6th Cir. 2005).  In this action,
however, even if the tripartite method were employed, this Court would not reach the third prong
based on its conclusion that the first two prongs are not met.

immunity." *Id*.

Here, viewing the evidence in the light most favorable to Plaintiff requires the conclusion that there is a material issue of fact as to whether the use of the taser on Plaintiff while she was holding on to the sink in cell 116 violated the Fourth Amendment. That is, if–as Plaintiff testified–her first interaction with the Muskingum County Deputy Sheriffs was when she excitedly requested them to help her by arresting the man who assaulted her in the South Town Café. At that time, Plaintiff was not yelling profanities or acting drunk and obnoxious in any way. She did not assault Deputy Wilhite and instead, it was Wilhite who shoved her with his chest causing her to lose her balance and brush his shoulder. After she was arrested and placed in one of the deputies' vehicles she got out only when requested to do so by Deputy Hittle not because she was attempting to escape. Further, Plaintiff was cooperative at the time of her booking, was cooperative on the way to the holding cell and was tasered by Deputy Wilhite in retaliation for her brushing his shoulder previously. Finally, Plaintiff was left in the holding cell crying and shaking from the first tasering and begging for medical attention, was bullied by three officers who entered her cell with their tasers drawn causing her to fear for her safety, grabbing the sink out of desperation.

Consequently, Plaintiff has raised a genuine issue of material fact as to whether the use of the taser on her in cell 116 was reasonable, Defendants are not entitled to qualified immunity. *See Saucier*, 533 U.S. at 201. Accordingly, the Court **DENIES** summary judgment in Defendants favor on this claim.

However, Plaintiff also moves for summary judgment on this incident of alleged excessive force. Viewing the evidence in the light most favorable to Defendants requires the

conclusion that there is a material issue of fact as to whether the use of the taser on Plaintiff while she was holding on to the sink in cell 116 was reasonable. That is, if–as Defendants testify–at their first encounter that evening, Plaintiff was intoxicated to the point of having trouble keeping her balance, yelled and screamed profanities at the deputies, assaulted Deputy Wilhite, was arrested for assault on a police officer, tried to escape after her arrest, was so disruptive that she could not be properly booked once at the jail, yelled profanities and repeatedly beat on the window once placed in a holding cell and <u>then</u> refused to sit in the restraint chair, which was brought to her cell to prevent her from hurting herself by banging on the window, struggled away from Deputy Inman's attempt to lead her to the chair, and grabbed the sink refusing to let go. This behavior was threatening to the deputies since they knew that another deputy was injured recently in a similar incident by slipping in the holding cell and cracking his skull.

Based on Defendants' rendition of the facts, the Court concludes that Defendants have raised a genuine issue of material fact as to whether the use of the taser on Plaintiff in cell 116 was reasonable and therefore, the Court **DENIES** summary judgment in Plaintiff's favor on this claim.

## B. Employer Excessive Use of Force Policies - Fourth Amendment

Plaintiff brings a Section 1983 claim against Muskingum County Sheriff Robert J. Stephenson in his official capacity, which seeks to impose liability upon Muskingum County. A municipal liability claim against Muskingum County must be examined by applying a two-pronged inquiry: that a constitutional violation occurred; and that the County "is responsible for that violation." *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir.

2004) (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 505-06 (6th Cir. 1996).  For liability to

attach, both questions must be answered in the affirmative.  *Id.*  This Court concluded *supra* that

Plaintiff has raised a genuine issue of material fact as to whether Defendants violated her rights

protected by the Fourth Amendment to the United States Constitution.  Accordingly, the issue

before this Court is whether Muskingum County is responsible for the alleged violations.

Plaintiff cannot base her claim against Muskingum County solely on the individual

deputies' conduct, for *respondeat superior* is not available as a theory of recovery under Section

1983.  *Monell v. Department of Social Servs.*, 436 U.S. 658, 691 (1978).  Rather, she must show

that the County itself is the wrongdoer.  *Doe*, 103 F.3d at 507 (citing *Collins v. City of Harker*

*Heights*, 503 U.S. 115, 122 (1992)).  Under *Monell*, the County cannot be found liable unless

Plaintiff "can establish that an officially executed policy, or the toleration of a custom within the

[Sheriff's Department] leads to, causes, or results in the deprivation of a constitutionally

protected right."  *Id.* (citing *Monell*, 436 U.S. at 690-91).  In this action, Plaintiff  does not assert

that the use of force upon her resulted from an officially enacted policy.  Rather, she claims that

Section 1983 liability exists due to a "custom," which, although not officially adopted or

established through the decision-making channels, led to the individual deputies using

unreasonable force on her.  *See id.* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121

(1988)).

A "custom" for purposes of *Monell* liability must "be so permanent and well settled as to

constitute a custom or usage with the force of law."  *Id.* (citing *Monell*, 436 U.S. at 691, internal

quotation marks and citation omitted).  "In turn, the notion of 'law' must include 'deeply

embedded traditional ways of carrying out state policy.' "  *Id.* (citing *Nashville, ChattanooSt. &*

16

*Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940)).  Indeed, the custom "must reflect a course of action deliberately chosen from among various alternatives." *Id.* (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985)).  "In short, a 'custom' is a 'legal institution' not memorialized by written law.' " *Id.* (*Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).

In addition to showing that the County "as an entity 'caused' the constitutional violation, Plaintiff must also show a direct causal link between the custom and the constitutional deprivation; that is, she must 'show that the particular injury was incurred because of the execution of that policy.' " *Id.* (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).  These stringent requirements are necessary to avoid *de facto respondeat superior* liability explicitly prohibited by *Monell*.  *Id.*

Here, Plaintiff contends that Muskingum County had a (1) "custom" of condoning excessive uses of force and that it had a (2) "custom" of failing to act to prevent the excessive uses of force.

### 1. Failure to train

Plaintiff contends that the Muskingum County Sheriff's Department had the custom of condoning the excessive use of force by failing to train the deputies under the use of force policies and, instead, granting the deputies unfettered discretion to use force in any situation. (Doc. # 1095, 10.)  It is  possible for municipalities to be sued under Section 1983 if they fail to adequately train their personnel such that a constitutional policy is applied in an unconstitutional way.  *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 819 (6th Cir. 2007) (citing Harris, 489 U.S. at 387).  "There, however, the plaintiff must show 'the failure to train amounts to deliberate indifference to [the] rights of persons with whom the police come into

17

contact.' " *Id.* (citing *City of Canton*, 489 U.S. at 388). In essence, the Sheriff's Department "must have exhibited deliberate indifference to 'known or obvious consequences,' and mere 'simple or even heightened negligence will not suffice' to render it liable." *Id.* (citing *Bd. of the County Comm'Rs v. Brown*, 520 U.S. at 397,407 (1997); *see also Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006)).

In this action, Plaintiff complains that the written policies were unknown to the deputies or were ignored and that the deputies had unfettered discretion to use force as they wished. Plaintiff presents deposition testimony from deputies to support her claims; however, the testimony simply fails to do so. For example, as support for her claim that the deputies were unaware of certain use of force policies, Plaintiff relies upon the proposition that Deputy Wilhite was never given a policy manual when he was hired by the Sheriff's Department. Wilhite Dep. at 189-90. However, Wilhite's testimony does not support Plaintiff's claim that Wilhite was unfamiliar with the policy or that it was ignored by him. Indeed, Wilhite testified that, although he was not provided a personal policy to take home with him he was told where the entire policy manual, including all use of force policies, was kept and where it could be reviewed. *Id.* Further, it is not contested that in February 2005, just two months before Plaintiff's arrest, the Sheriff's officers received Taser training. Wilhite Dep. at 196. Moreover, Sheriff's officers are trained for Taser certification and recertification every year. Wilson Dep. at 11. Plaintiff has inappropriately taken this testimony out of context.

As an example of Plaintiff's inadequate support for her claim that the deputies possessed unfettered discretion to engage in the use of force, Plaintiff relies on deposition testimony that is similarly taken out of context. Further, Plaintiff relies upon nine use of force incidents that were

18

reviewed by Plaintiff's expert.  Plaintiff claims that her expert[5] reviewed nine random uses of the

Taser by deputies which show that use of force was openly permitted upon non-violent

prisoners; however, again the Court concludes that the evidence does not show what Plaintiff

contends that it does.  For example, Plaintiff argues that Jeremy Hankinson was tasered "for

being uncooperative during handcuffing."  (Doc. # 108, Ex. 7 at 27.)  The narrative report upon

which this proposition was obtained indicates that Mr. Hankinson was apprehended after a

vehicle chase resulting from Mr. Hankinson taking an officer's weapon. (Doc. # 121, Ex. G).

Mr. Hankinson eventually left his vehicle and began running in a grassy area.  It was dark and

after a struggle to arrest Mr. Hankinson, Hankinson and the officer fell to the ground where

Hankinson refused to release his left arm, which was underneath his stomach.  The arresting

officer feared that Hankinson had the stolen weapon with him.  Because Mr. Hankinson refused

to

remove his arm from under his body, the officer tasered him.  Hankinson was not a "non-

violent" arrestee.  Instead, he clearly created a dangerous, volatile situation to which the deputies

involved were required to react.

　　　　The Court concludes that, even when viewing the evidence in the light most favorable to

Plaintiff, Plaintiff failed to raise a genuine issue of material fact as to her failure to train claim.


### 2.  Failure to investigate

Plaintiff argues that the Muskingum County Sheriff's Department had the custom of

---

[5]When viewing expert opinions on summary judgment this Court is instructed that "being
an expert does not lessen the burden one has in rebutting a motion for summary judgment."
*Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).

failing to investigate uses of force and thereby ratifying the uses instead of preventing them.

> To state a municipal liability claim under an "inaction" theory, Plaintiff must establish:
>
> (1) the existence of a clear and persistent pattern of [excessive uses of force] by [Sheriff Department] employees;
>
> (2) notice or constructive notice on the part of the [the Sheriff's Department];
>
> (3) the [Sheriff Department]'s tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> (4) that the School Board's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Doe*, 103 F.3d at 508 (citing *Harris*, 489 U.S. 378, 388-89).  The *Monell* custom requirement is an essential element of this claim.  *Id.*  "The evidence must show that the need to act is so obvious that the [Sheriff's Department]'s 'conscious' decision not to act can be said to amount to a 'policy' of deliberate indifference to [Plaintiff]'s constitutional rights."  *Id.* (citing *Harris*, 489 U.S. at 389).  "Deliberate indifference" in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to use of force abuses.

Here, the evidence submitted by Plaintiff wholly fails to show a pattern of unconstitutional uses of force.  Indeed, it is uncontroverted that, in the three years 2004 through 2006, Muskingum County Deputies arrested 9,157 persons and used a Taser device on only 48 occasions, or approximately ½ to 1% of all arrests.  (Doc. # 124, Ex. A.)  This statistic alone belies Plaintiff's contention that there is widespread, permanent and well settled failure to abide by the use of force policies.  Moreover, Plaintiff complains only of the perceived inadequacy of Defendants' investigation into <u>her</u> complaint of unconstitutional use of force.  (*See* Doc. # 109 at

20

10.)  Clearly, this type of evidence is insufficient to show a pattern of conduct.

The Court concludes that, even when viewing the evidence in the light most favorable to Plaintiff, Plaintiff failed to raise a genuine issue of material fact as to her failure to investigate claim.  Accordingly, the Court **GRANTS** Defendants summary judgment on Plaintiff's *Monell* claim.

## C.  Denial of Medical Care - Eighth Amendment

Plaintiff asserts that, after she was first tasered by Deputy Wilhite, she was placed in holding cell 116 and immediately began to experience medical symptoms, which she believed at the time may have been a heart attack.  Plaintiff claims that Defendants failed to respond appropriately, thereby denying her constitutionally sufficient medical care.

The United States Court of Appeals for the Sixth Circuit has noted that "[t]he Supreme Court decided many years ago that the government has an 'obligation to provide medical care for those whom it is punishing by incarceration,' and that 'deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment.' "  *Tate v. Coffee County, Tenn.*, 48 F. App'x 176, 180 (6th Cir. 2002) *(*quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976) (internal citations omitted)).  The Due Process Clause of the Fourteenth Amendment in turn prohibits deliberate indifference to the medical needs of pretrial detainees.  *Preyor v. City of Ferndale*, No. 06-1995, 2007 WL 2566025, at *5 (6th Cir. Sept. 5, 2007).

In discussing the applicability of these Amendments, the Sixth Circuit has noted that "the distinction is without a difference because, under either Amendment, '[t]he test to determine whether [a defendant] acted with "deliberate indifference" has an objective and subjective

21

component.' " *Id.* (quoting *Napier v. Madison County,* 238 F.3d 739, 742 (6th Cir. 2001)).  *See also Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).  The former requires a showing that the harm is sufficiently serious (*i.e.*, a substantial risk of harm), while the latter necessitates demonstrating that the state officials had a sufficiently culpable state of mind (*i.e.*, the official knows of and disregards an excessive risk to inmate health).  *Preyor*, 2007 WL 2566025, at *5; *Brown*, 207 F.3d at 867; *Bilaal v. Defiance Publ'g Co.*, No. 3:03 CV 07189, 2004 WL 2750227, at *3 (S.D. Ohio Dec. 1, 2004).

Defendants argue, *inter alia*, that Plaintiff has failed to raise a material issue of fact with regard to the subjective component of this analysis.  This Court agrees.

In considering the subjective component, this circuit has emphasized that a plaintiff must produce evidence showing "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.2001).  The subjective component requires that an official who actually knew of the serious medical need possessed "a sufficiently culpable state of mind in denying medical care."  *Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir.2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  "Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'"  *Id.* at 813 (quoting Farmer, 511 U.S. at 835).  The Supreme Court has also said, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 838.

22

Here, Plaintiff fails to show that any Defendant possessed "a sufficiently culpable state of mind in denying medical care." *Miller*, 408 F.3d at 812.  Indeed, the evidence shows at most that Defendants should have perceived a more immediate risk to Plaintiff's health and instead of attempting to locate her medicine should have called for medical help.  While Defendants' actions may have been negligent, it falls far short of the infliction of harm. *See Farmer*, 511 U.S. at 838.

Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as it relates to Plaintiff's claim of constitutionally insufficient medical care.

### D.  Cover-up - Fifth and Fourteenth Amendments

Plaintiff argues that Defendants' alleged "cover-up" violates three different rights secured by the United States Constitution.

Plaintiff first argues that "suppression of evidence which supports a citizen's claim of innocence is also a violation of that citizen's constitutional rights guaranteed by the Fifth and Fourteenth Amendments. *Brady v. Maryland*, 373 U.S. 83 (1963)."  The Sixth Circuit explained that "*Brady* and its progeny established the prosecutor's duty to disclose to the defendant exculpatory evidence, defined as material evidence that would have a bearing upon the guilt or innocence of the defendant." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998)(citing *Brady*, 373 U.S. at 87, *United States v. Agurs*, 427 U.S. 97, 112-13 (1976) and *United States v. Bagley*, 473 U.S. 667, 678 (1985).  This rule, derived from due process, helps to ensure fair criminal trials, protecting the presumption of innocence for the accused, while forcing the state to present proof beyond a reasonable doubt. *Id.* (citing *Bagley*, 473 U.S. at 675; *Brady*, 373 U.S. at 87).  Violation of this right can give rise to a claim under Section 1983. *See e.g., Gregory v.*

*Louisville*, 444 F.3d 725, 743 (6th Cir. 2006).

In the instant action, Plaintiff makes this claim in relation to the criminal charges that were brought against her for assault on a police officer.  Plaintiff, however, fails utterly to show how the information she claims has been covered-up had any bearing on her guilt or innocence in the criminal charges against her.  Indeed, the only evidence before this Court related to these criminal charges is Plaintiff's statement that she pleaded guilty to persistent disorderly conduct, assault, and escape.  Pl. Dep. at 302.

Second, Plaintiff argues that destruction of evidence "may amount to a due process violation."  However, as this Court explains *infra*, Plaintiff has failed to raise a genuine issue of material fact as to a destruction of evidence claim, i.e., her spoliation of evidence claim.  Thus, Plaintiff cannot establish a constitutional due process violation, even if this Court were to accept the premise that such a claim exists under Section 1983, based on the alleged destruction of evidence.

Finally, Plaintiff contends that Defendants' actions in attempting to "cover-up" evidence amounts to a denial of the right to access to the courts.  Plaintiff argues that Defendants failed to conduct an appropriate investigation of Plaintiff's complaint and the "net result was that no more evidence was gathered or preserved, and no further interviews were done."  (Doc. # 123 at 21.) Further, Plaintiff argues that, looking at all of the facts "cumulatively suggest a desire to leave no evidentiary trail."  *Id.* at 22.  However, even if Plaintiff's allegations were true, Plaintiff has failed to raise a genuine issue of material fact as to a denial of access to courts claim.

The right of access to the courts is a fundamental right protected by the United States Constitution.  *Swekel v. City of River Rouge*, 119 F.3d 1259, 1261 (6th Cir. 1997); *Graham v.*

24

*Nat'l Collegiate Athletic Ass'n*, 804 F.2d 953, 959 (6th Cir. 1986).  This right encompasses a person's right to physically access the court system and ensures the access will be "adequate, effective, and meaningful."  *Bounds v. Smith*, 430 U.S. 817, 822 (1977).  Therefore, if a party engages in actions that effectively cover-up evidence and this action renders a plaintiff's court remedy ineffective, they have violated his right of access to the courts.  *Swekel*, 119 F.3d at 1262.

With regard to a denial of access to court claim based upon an alleged police "cover-up," the Sixth Circuit has explained:

> A court must analyze several factors before deciding whether a person's fundamental right of access to the courts has been violated.  First, a court must ascertain whether the abuse occurred pre- or post-filing.  When the abuse transpires post-filing, the aggrieved party is already in court and that court usually can address the abuse, and thus, an access to courts claim typically will not be viable.  If the abuse occurs pre-filing, then the plaintiff must establish that such abuse denied her "effective" and "meaningful" access to the courts.  *Bounds*, 430 U.S. at 822.  She can do this only by showing that the defendants' actions foreclosed her from filing suit in state court or rendered ineffective any state court remedy she previously may have had.

*Id.* at 1263-64 (citations omitted).

Here, Plaintiff alleges pre-filing abuses related to Defendants alleged insufficient investigation of her civil complaint about the night of her arrest.  In analogous circumstances, the *Swekel* court further instructs:

> The alleged actions occurred pre-filing, and thus, Swekel bears the burden of showing that such actions foreclosed her from filing suit in state court. The most compelling evidence would be if Swekel went to the state courthouse and was physically prevented or mechanically barred from filing her lawsuit or her suit was dismissed as untimely. . . .
>
> Our inquiry, however, does not conclude at this point.  This case does not involve an issue of whether the Plaintiff could enter the courthouse and file suit, but instead whether filing such a suit was rendered ineffective by the Defendants'

25

actions.

Swekel alleges that the police covered-up proof against one of their own, destroyed critical evidence, and delayed Swekel's own investigation.  These allegations, if true, would substantially prejudice Swekel's ability to recover in state court. . . .

Swekel, however, never presented evidence that the state court could not adequately address these problems.   In fact, none of the evidence before this court establishes that Swekel even attempted to go to the state court in first instance. Before filing an "access to courts" claim, a plaintiff must make some attempt to gain access to the courts; otherwise, how is this court to assess whether such access was in fact "effective" and "meaningful"?

*Id.* at 1264.

Like in Swekel, Plaintiff has failed to attempt to gain access to the courts; and, therefore this Court cannot assess whether she has been denied effective and meaningful access to the courts.  Accordingly, the Court **GRANTS** Defendants' motion for summary judgment as it relates to Plaintiff's cover-up claim.

## IV.  SECTION 1985

Plaintiff alleges a conspiracy claim under 42 U.S.C. § 1985(3), claiming that "the said acts by the Defendants were done jointly and in conjunction with each other; under color of state law; wantonly, reckless, in bad faith and/or maliciously."  (Doc. # 96 ¶ 15).  To prevail on a conspiracy claim, Plaintiff must show:

(1) A conspiracy;

(2) For the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws;

(3) An act in furtherance of the conspiracy;

(4) Whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

26

*Vakilian v. Shaw*, 335 F.3d 509, 518 (6th Cir. 2001) (quoting *United Bhd. Of Carpenters &*

*Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)).  The acts which are alleged to have deprived the

plaintiff of equal protection must be the result of class-based discrimination.  *Newell v.*

*Brown*, 981 F.2d 880, 886 (6th Cir. 1992).

Plaintiff has failed to meet her respective burden, as she did not allege any class-based

discrimination claims.  Moreover, although Defendants moved for summary judgment on this

claim, Plaintiff failed to rebut any of Defendants arguments or evidence in her memorandum in

opposition to Defendants' summary judgment motion.  In ruling on a motion for summary

judgment this Court is not "obligated to wade through and search the entire record for some

specific facts that might support the nonmoving party's claim."  *Glover v. Speedway Super Am.*

*LLC*, 284 F. Supp.2d 858, 862 (S.D. Ohio 2003) (citing *InterRoyal Corp. v. Sponseller*, 889 F.2d

108, 111 (6th Cir. 1989)).  Instead, a "court is entitled to rely, in determining whether a genuine

issue of material fact exists on a particular issue, only upon those portions of the verified

pleadings, depositions, answers to interrogatories and admissions on file, together with any

affidavits submitted, specifically called to its attention by the parties."  *Id.*; Fed. R. Civ. P. 56(c).

Accordingly, the Court **GRANTS** Defendants summary judgment as it relates to

Plaintiff's conspiracy claim.

## V.  SPOLIATION OF EVIDENCE UNDER OHIO LAW

The Ohio Supreme Court has set forth the following elements in a claim of spoliation of

evidence:  (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of

defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant

designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages

proximately caused by the defendant's acts.  *Smith v. Howard Johnson Ins. Co., Inc.*, 67 Ohio St.3d 28, 29 (1993).  To establish a claim of spoliation of evidence the plaintiff must show willful or purposeful conduct by the defendant designed to disrupt or deter litigation.  *White v. Ford Motor Co.*, 142 Ohio App.3d 384, 387-88 (10th Dist. 2001).

In the instant action, Plaintiff argues that there is certain evidence that appears to be missing, such as video from a jail camera which, although the camera had the ability to video the evening of Plaintiff's arrest, it is uncontroverted that the video was not used that night.  This type of claim, however, is more appropriately the subject of cross examination than a claim of spoliation (or a claim of a constitutional deprivation).  Indeed, spoliation requires a showing of a willful destruction, alteration or concealment of evidence.  *See Drawl v. Cornicelli*, 124 Ohio App.3d 562, 568 (11th Dist. 1997).  Even viewing the evidence in the light most favorable to Plaintiff, she simply has presented no evidence of willful destruction of evidence.

Accordingly, Plaintiff has failed to raise a genuine issue of material fact as to her claim of spoliation of evidence and, therefore, the Court **GRANTS** Defendants summary judgment on that claim.

## VI.  CONCLUSION

Based on the foregoing, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment - Excessive Force Claim (Doc. # 108), **DENIES** Plaintiff's Second Motion for Partial Summary Judgment - Employer Liability (Doc. # 109), and **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment by Muskingum County Defendants (Doc. # 111).  Specifically, the Court **DENIES** Defendants' motion with regard to Plaintiff's claims of excessive force based on the alleged tasering and kicking incidents and **GRANTS** Defendants'

28

motion in all other respects.

**IT IS SO ORDERED.**

**/s/ Gregory L. Frost**
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**